IN THE COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————————————————————

No. 21-11329

————————————————————————

SKY HARBOR ATLANTA NORTHEAST, LLC
and CRESTLINE HOTELS & RESORTS, LLC,
Plaintiffs/Appellants,

v.

AFFILIATED FM INSURANCE COMPANY,
Defendant/Appellee.

————————————————————————

On appeal from the U.S. District Court
Northern District of Georgia, Atlanta Division
Civil Action No. 1:17-CV-3910-JPB

————————————————————————

**BRIEF OF APPELLANTS**

Michael L. Childress
Thomas J. Loucks
CHILDRESS LOUCKS
 & PLUNKETT, LTD.
11 W. Illinois, 4th Floor
Chicago, Illinois 60654

Michael A. Dailey
ANDERSON DAILEY LLP
2002 Summit Blvd., Suite
1250
Atlanta, Georgia 30319

Michael B. Terry
Frank M. Lowrey IV
Megan E. Cambre
BONDURANT MIXSON
 & ELMORE, LLP
1201 W. Peachtree St., NW, #3900
Atlanta, Georgia 30309

Christopher B. Noyes
Katherine A. Bruce
Brian S. Kabateck
KABATECK LLP
633 W. Fifth Street, Suite 3200
Los Angeles, California 90071

*Attorneys for Appellants*

*Sky Harbor Atlanta Northeast, LLC, et al. v. Affiliated FM Insurance Company*
No. 21-11329

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and Local Rule 26.1-1(a), Appellants hereby file this Certificate of Interested Persons, which includes trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

- Affiliated FM Insurance Company, Appellee

- ASAP Property Holdings, Inc.

- Barcelo Corporacion Empresarial, SA

- Barcelo Crestline Corp.

- Laura Bartlow, Esq., ZELLE, LLP, Counsel for Appellee

- BCE-BCC, LLC

- The Honorable J.P. Boulee, U.S. District Judge, Northern District of Georgia

- Katherine Bruce, Esq., KABATECK, LLP, Counsel for Appellants

- Megan E. Cambre, Esq., BONDURANT MIXSON & ELMORE, LLP, Counsel for Appellants

- Michael Childress, Esq., CHILDRESS LOUCKS & PLUNKETT, LTD, Counsel for Appellants

- James V. Chin, Esq., ZELLE, LLP, Counsel for Appellee

- Constellation Capital, LLC

- Crestline Hotels & Resorts, LLC, Appellant

- Wei Cui

- Michael Alan Dailey, Esq., ANDERSON DAILEY, LLP, Counsel for Appellants

- Robert N. Dokson, ELLIS FUNK, P.C., Special Master

- Factory Mutual Insurance Company

- JVW Investments LLC

- Brian S. Kabateck, Esq., KABATECK, LLP, Counsel for Appellants

- Elizabeth Kniffen, Esq., ZELLE, LLP-MN, Counsel for Appellee

- Thomas J. Loucks, Esq., CHILDRESS LOUCKS & PLUNKETT, LTD, Counsel for Appellants

- Frank M. Lowrey IV, Esq., BONDURANT MIXSON & ELMORE, LLP, Counsel for Appellants

- Jonathan R. MacBride, Esq., ZELLE, LLP, Counsel for Appellee

- Christopher B. Noyes, Esq., KABATECK, LLP, Counsel for Appellants

- Megan Shutte, Esq., ZELLE, LLP-MN, Counsel for Appellee

- Sky Harbor Atlanta Northeast, LLC, Appellant

- Michael B. Terry, Esq., BONDURANT MIXSON & ELMORE, LLP, Counsel for Appellants

- The Honorable Amy Totenberg, U.S. District Judge, Northern District of Georgia

- Christopher Leo Troy, Esq., ZELLE, LLP, Counsel for Appellee

- Julia Wong

- Vicky Yuan

No publicly held company owns more than 10% of the stock of either Appellant.

## STATEMENT REGARDING ORAL ARGUMENT

This case requires the application of contract interpretation principles to a "all-risk" insurance policy in the context of an extensive factual record. All-risk policies are a common form of property insurance, and their interpretation is important to many insurers and property owners. If the opinion below withstood appeal, it would create an implicit and significant limitation in the coverage afforded by these policies—a limitation untethered to any actual policy language and not recognized by the governing law. Accordingly, Appellants believe that oral argument will assist this Court's consideration of this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF AUTHORITIES ....................................................... v

STATEMENT OF JURISDICTION ........................................... ix

STATEMENT OF THE ISSUES ............................................... 1

STATEMENT OF THE CASE ................................................. 3

    *Acquisition of the Hotel* .................................................. 3

    *The 2015 renovation reveals extensive recent water intrusion, water damage, and mold* ................................................ 9

    *AFM investigates the claims and denies coverage* ...................... 11

    *The Policy language* ..................................................... 13

    *The summary judgment ruling* ........................................ 16

STANDARD OF REVIEW ....................................................... 17

SUMMARY OF ARGUMENT ................................................... 19

ARGUMENT AND AUTHORITIES ......................................... 24

    I.    The Policy covers physical loss and damage to the Hotel even if it resulted from construction or design defects that existed since the original construction ............ 24

A. No Policy language limits or excludes coverage for physical loss or damage resulting from a pre-Policy defect in construction or design .......................... 24

B. The phrase "direct physical loss or damage" does not implicitly bar recovery for losses resulting from pre-Policy defects ................................................. 26

II. The Policy does not bar coverage for direct physical loss or damage if it occurred or started before the Policy period ...................................................................... 35

A. The Policy language does not limit or exclude coverage for costs incurred during the Policy period to repair physical damage that occurred before the Policy period ................................................. 37

B. Georgia has not recognized an implied exclusion for losses known to the insured before the Policy period ........................................................................... 38

C. Applying any "known loss," "expected loss," or "fortuity requirement" here would depend on issues of disputed fact ................................................ 39

D. At a minimum, Plaintiffs may recover the costs to repair physical loss or damage that occurred within the Policy period ................................................ 46

III. Before reading any unstated coverage limitations into the Policy, the Court should certify the issue to the Georgia Supreme Court ........................................................ 50

IV. The district court erred in granting summary judgment on Plaintiffs' claim for bad faith denial of coverage ............. 51

V.    Sky Harbor is an insured under the Policy for purposes of loss or damage to the Hotel, and Crestline is also a named insured entitled to recover under the Policy ............ 51

    A.    Sky Harbor is an insured under the Policy for purposes of loss or damage to the Hotel ..................... 52

    B.    Crestline is also a named insured entitled to the benefits AFM owes under the Policy ........................... 54

CONCLUSION ........................................... 56

CERTIFICATE OF COMPLIANCE ........................ 58

CERTIFICATE OF SERVICE ............................. 59

iv

# TABLE OF AUTHORITIES

Case                                                                                    Page

*AFLAC Inc. v. Chubb & Sons, Inc.*,
    260 Ga. App. 306 (2003) ........................................................ *passim*

*Alea London Ltd. v. Am. Home Servs., Inc.*,
    638 F.3d 768 (11th Cir. 2011) ......................................................... 18

*Am. Ins. Co. v. Bateman*,
    125 Ga. App. 189 (1971) ................................................................. 55

*Am. Reliable Ins. Co. v. Woodward*,
    143 Ga. App. 652 (1977) ................................................................. 55

*Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*,
    136 F.Supp.2d 1340 (N.D. Ga. 2001) ............................................ 38

*Atl. Mut. Ins. Co. v. Lotz*,
    384 F. Supp. 2d 1292 (E.D. Wis. 2005) ......................................... 40

*Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    304 Ga. App. 314 (2010) ................................................ 18, 25, 38, 53

*Broome v. Allstate Ins. Co.*,
    144 Ga. App. 318 (1977) ................................................................. 23

*Buscher v. Economy Premier Assur. Co.*,
    2006 WL 268781 (D. Minn. 2006) ....................................... 32-33, 35

*Calabro v. Liberty Mut. Fire Ins. Co.*,
    253 Ga. App. 96 (2001) ................................................................... 37

*Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of New York*,
    600 F. Supp. 2d 1228 (S.D. Ala. 2009) .......................................... 39

*Cincinnati Ins. Co. v. Davis,*
    153 Ga. App. 291 (1980) ................................................................ 25

*City of Burlington v. Indem. Ins. Co. of N. Am.,*
    332 F.3d 38 (2d Cir. 2003)........................................................ 41, 51

*Claussen v. Aetna Cas. & Sur. Co.,*
    865 F.2d 1217 (11th Cir. 1989) ...................................................... 50

*Columbia Cas. Co. v. Plantation Pipe Line Co.,*
    338 Ga. App. 556 (2016) ............................................................38-39

*Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc.,*
    266 Ga. 260 (1996).......................................................................... 37

*Copeland v. Home Grown Music, Inc.,*
    358 Ga. App. 743 (2021) ................................................................ 47

*Eckstein v. Cincinnati Ins. Co.,*
    469 F. Supp. 2d 444 (W.D. Ky. 2007) .................................. 32, 34-35

*Ellis v. England,*
    432 F.3d 1321 (11th Cir. 2005) ...................................................... 18

*Essex Ins. Co. v. H & H Land Dev. Corp.,*
    525 F. Supp. 2d 1344 (M.D. Ga. 2007)........................................... 38

*Flynt v. Life of S. Ins. Co.,*
    312 Ga. App. 430 (2011) ................................................................ 47

*Georgia Farm Bureaus Mut. Ins. Co. v. Franks,*
    320 Ga. App. 131 (2013) ............................................................54-56

*Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.,*
    2021 WL 3870697 (11th Cir. Aug. 31, 2021) .................................. 28

*Great Am. All. Ins. Co. v. Anderson,*
    847 F.3d 1327 (11th Cir. 2017) ...................................................... 39

*In re EHT US1, Inc., et al.,*
  Case No. 21-10036 (KBO), United States Bankruptcy Court
  for the District of Delaware ............................................................. ix

*Ingenco Holdings, LLC v. Ace Am. Ins. Co.,*
  921 F.3d 803 (9th Cir. 2019) ......................................................... 40

*Lipsitz v. Fireman's Fund Insurance Co.,*
  183 Ga. App. 270 (1987) ............................................................ 48-49

*Lunceford v. Peachtree Cas. Ins. Co.,*
  230 Ga. App. 4 (1997) .............................................................. 19, 38

*McGrath v. Am. Family Mut. Ins. Co.,*
  2008 WL 4531373 (N.D. Ill. 2008) .....................................32, 34-35

*Morrison Grain Co. v. Utica Mut. Ins. Co.,*
  632 F.2d 424 (5th Cir. 1980) ......................................................... 40

*NUCO Invs., Inc. v. Hartford Fire Ins. Co.,*
  2005 WL 3307089 (N.D. Ga. Dec. 5, 2005) ........................21, 32, 35

*Scruggs v. Purvis,*
  218 Ga. 40 (1962) ........................................................................... 54

*Sun Insurance Office, Ltd. v. Guest Camera Store, Inc.,*
  108 Ga. App. 339 (1963) ................................................................ 48

*Trinity Industries v. Insurance Co. of North America,*
  916 F.2d 267 (5th Cir. 1990) .....................................................29-30

*Western Pacific Mut. Ins. Co. v. Davies,*
  267 Ga. App. 675 (2004) ............................................... 19, 20, 22, 25

*Whiteside v. GEICO Indem. Co.,*
  977 F.3d 1014 (11th Cir. 2020) ..................................................... 51

<u>Other</u>:

28 U.S.C. § 1291................................................................................ ix

43 Am. Jur. 2d Insurance § 469 ......................................................... 40

Fed. R. Civ. P. 25(c) ............................................................................ x

O.C.G.A. § 15-2-9 .............................................................................. 50

O.C.G.A. § 33-4-6(a).......................................................................... 17

Restatement of Contracts § 291 .......................................................... 40

28 U.S.C. § 1332................................................................................ ix

## STATEMENT OF JURISDICTION

This appeal is from a final district court judgment entered based on the grant of summary judgment on all claims by all parties.

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between citizens of different states. The order granting both sides' motions for summary judgment was entered on March 15, 2021. Dkt. 289. The district court entered final judgment on March 16, 2021. Dkt. 290. Appellants filed a timely notice of appeal on April 14, 2021. Dkt. 294. So this Court has jurisdiction over this appeal from final judgment pursuant to 28 U.S.C. § 1291.

Relatedly, the bankruptcy proceedings involving Sky Harbor Atlanta Northeast, LLC ("Sky Harbor") do not preclude resolution of appellants' appeal.[1] Sky Harbor purchased the hotel at issue in this case in 2013. Sky Harbor filed this suit in 2017, along with its co-plaintiff and appellant Crestline Hotels & Resorts, LLC, which managed the hotel for Sky Harbor. Dkt. 1. In 2018, Sky Harbor

---

[1] *In re EHT US1, Inc., et al.*, Case No. 21-10036 (KBO), United States Bankruptcy Court for the District of Delaware.

assigned the right to pursue and receive the proceeds of the insurance claim to its then-owner—ASAP Property Holdings, Inc. ("ASAP Property"). ASAP Property did not move to substitute itself for Sky Harbor as a named plaintiff in the district court, nor was there any requirement to do so.[2]

In early 2021, Sky Harbor—now owned by an entity unrelated to ASAP Property—filed for bankruptcy protection.[3] When Appellants' counsel learned of that development, Appellants alerted this Court and requested a stay of the appeal. During that stay, ASAP Property initiated an adversary proceeding in Sky Harbor's bankruptcy to resolve any question by any participant in those proceeds whether ASAP Property owned the insurance claim that it was prosecuting in Sky Harbor's name, as opposed to that claim being part of the bankruptcy estate, subject to creditor claims.

---

[2] The Federal Rule of Civil Procedure governing substitution of parties provides: "If an interest is transferred, the action *may be continued by* or against *the original party* unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c) (emphasis added).

[3] *See* note 1 *supra*.

That adversary proceeding was resolved by a May 6, 2022 Stipulation entered in Sky Harbor's bankruptcy.[4] That Stipulation quitclaimed to ASAP Property any interest that Sky Harbor may or may not have in the insurance claim against AFM. *Id.* By doing so, the Stipulation resolved any potential dispute over the effectiveness of Sky Harbor's 2018 pre-bankruptcy assignment to ASAP Property of the right to pursue and receive the proceeds of the insurance claim asserted in this action.

In that Stipulation, Sky Harbor's liquidating trustee agreed that "ASAP Property may continue to prosecute, settle or otherwise dispose of the AFM Lawsuit in its sole and absolute discretion, and that the AFM Lawsuit (*including any appeals*) may continue without regard to any impediments that may exist as a result of the automatic stay or the Plan."[5] Accordingly, this appeal may proceed.[6]

---

[4] Appellants' Motion to Substitute (May 18, 2022), Ex. A.

[5] Appellants' Motion to Substitute (May 18, 2022), Ex. A at 4 ¶ 2 (emphasis added).

[6] To avoid any future confusion, particularly on the part of non-parties, Appellants moved this Court to substitute ASAP Property for Sky Harbor under F.R.A.P. 43. *See* Appellants' Motion to Substitute (May 18, 2022). Appellee opposed that motion on various fact-intensive grounds, but both sides agree that substitution need not occur for

Appellants' appeal to proceed. *See* Appellants' Reply Regarding Motion to Substitute (June 15, 2022).

## STATEMENT OF THE ISSUES

This case involves an "all-risk" insurance policy, a common form of property insurance. The policy here covered physical loss and damage to the insured hotel arising from any risk not expressly excluded from coverage. Appellants seek coverage under this policy for the costs of repairing extensive water and mold damage they discovered in 2015, during the policy period.

The district court held that there was no insurance coverage as a matter of law because the damage discovered during the policy period was ultimately attributable to construction and design defects that existed prior to the policy period. Dkt. 289 at 10.[7] The court acknowledged that the policy contains no express limitation excluding coverage if physical loss or damage resulted from a defect that existed when the policy went into effect. But it nevertheless held that such resulting losses were not covered, based on unstated limitations

---

[7] All page citations are to the page number that appears in the CM/ECF header at the top of the page, rather than any internal page numbering.

1

supposedly implied by the nature of an all-risk policy or the concepts of "risk" and "fortuity."

This appeal presents the following issues:

1)    Whether the district court erred in concluding, as a matter of law, that the hotel suffered no physical loss or damage covered by the all-risk insurance policy.

2)    Whether the district court erred in granting summary judgment on the insurer's liability for bad faith denial of coverage, a holding based solely upon the court's conclusion that there was no covered loss.

3)    Whether Sky Harbor Atlanta Northeast, LLC (the entity that owned the hotel at the time of the losses and when this suit was filed) was an insured under the policy for the purposes of any loss or damage to the hotel.[8]

---

[8] No one disputes that plaintiff/appellant Crestline Hotels & Resorts, LLC, which managed and obtained insurance for the hotel, is a named insured. No one disputes that the hotel is an insured property. *See, e.g.*, Dkt. 289 at 3 (summary judgment order finding that AFM insured the hotel through policies issued to Crestline).

## STATEMENT OF THE CASE

Appellants Sky Harbor Northeast, LLC ("Sky Harbor") and
Crestline Hotels & Resorts, LLC ("Crestline") (together, "Plaintiffs")
seek coverage under their all-risk policy for extensive water and mold
damage they discovered during the period that the appellee, Affiliated
FM Insurance Company ("AFM"), insured the Atlanta Hilton Northeast
Hotel ("the Hotel").[9]

### *Acquisition of the Hotel*

The Hotel consists of a 10-floor structure with 272 guest rooms
("the tower") as well as common space, including meeting rooms and a
ballroom, located in a low-rise portion of the building. *See* Dkt. 239-16
at 2; Dkt. 265-17 at 34-35. Sky Harbor purchased the Hotel on
November 5, 2013. Dkt. 239-1 at 2; Dkt. 256 at 6; Dkt. 237-8. Crestline,
a leading provider of hotel management services, operated and
managed the Hotel on Sky Harbor's behalf. Dkt. 239-9 at 1.

Crestline amended its existing all-risk policy with AFM to add the
Hotel to the list of insured locations, effective as of the date of Sky

---

[9] Regarding the status of Sky Harbor and its relationship to ASAP
Property, *see* appellants' Statement of Jurisdiction.

Harbor's purchase. *See* Dkt. 239-4. In exchange, Crestline agreed to pay an additional annual premium. *Id.* Crestline renewed this policy with AFM in 2014 and again in 2015. *See* Dkt. 237-3; 239-5; 239-6. The policy language is the same across all three policy years. *Id.*; Dkt. 239-4. So, for simplicity's sake, we refer to the "Policy," even though AFM technically issued three identical policies covering the Hotel.

Before acquiring the Hotel, Sky Harbor retained third-party experts AEI and CERES to evaluate the property, and it obtained an appraisal analysis from PKF Consulting. Dkt. 240-26 at 86:8-21; *id.* at 103:11-16; *id.* at 20:13-23; Dkt. 265-17. Each of these experts indicated that the Hotel was in a satisfactory condition as of 2013.

For example, AEI performed a Property Condition Evaluation and determined that the Hotel was in "overall good condition." Dkt. 265-15 at 8. AEI reported that the "Substructure," "Superstructure," "Windows," "Doors/Frames," and "Roof Drainage" were "[g]ood," with no action items. *Id.* at 6, 25. AEI did not identify any "material deficiencies," that is, deficiencies that required immediate corrective action. *Id.* at 8.

AEI further reported that the Hotel's then-general manager represented that there were no "complaints regarding window leaks or window condensation," "that he was not aware of mold or microbial growth at the Hotel and that occupants have not had complaints concerning mold or microbial growth." *Id.* at 265-15 at 27; *id.* at 49. The general manager was also not aware of any roof leaks, water leaks or infiltration, nor of any associated damage. *Id.* at 49. AEI concluded that "[t]here was no evidence of window leaks or condensation," *id.* at 27. AEI also conducted its own survey for mold and found no evidence of "microbial growth and/or water damage." *Id.* at 49.

The CERES report likewise indicated that the Hotel was in good condition. CERES found no signs of significant staining or corrosion inside the building and that the "building construction materials appeared to be in good condition." Dkt. 265-16 at 9, 10. The appraisal report from PKF Consulting similarly noted that there were "[n]o major defects or deferred maintenance" and that the functional utility of the Hotel was "good." Dkt. 265-17 at 39, 41. In addition, PKF's appraiser inspected the Hotel and found no evidence of structural deficiencies. *Id.* at 135.

During due diligence, Sky Harbor reviewed seller-provided property condition reports. *See* J. Yuan Depo., Dkt. 240-26 at 37:2-12; *id.* at 68:14-19. These included reports generated when the seller had originally acquired the Hotel. *Id.* at 78:20-21; 79:16-21. At least one report from 2003 mentioned mold in the first-floor ballroom. *Id.* at 78:12-15. This was ten years before Sky Harbor bought the Hotel and ten years before the satisfactory evaluations by AEI, CERES, and PKF Consulting.

Jerome Yuan, chief investment officer at ASAP Property and a corporate designee for Sky Harbor, testified that, after reviewing the due diligence reports described above, he "didn't think that there was a mold problem or any cause of mold at the hotel." Dkt. 240-26 at 85:17-20. He personally inspected the Hotel in 2013 and saw no evidence of the problems referenced in the 2003 report. *Id.* at 79:25-80:6. And he believed that the seller had fixed any mold or water intrusion problems referenced in the old 2003 report, particularly after reviewing the seller's maintenance and improvement records.[10]

---

[10] *See* Dkt. 240-26 at 81:10-13 ("the report was from 2003. . . I expected the ownership to fix any problems."); *id.* at 82:4-9 ("[T]he seller provided their historical capex invoices where they fixed -- I mean,

During due diligence, Sky Harbor became aware of a few "spot" problems that were consistent with regular maintenance issues in a hotel of this size. Dkt. 240-25 at 71:5. These issues existed in approximately 20 (out of 272) guest rooms. *See* Dkt. 239-16 at 2. Both Jerome Yuan and Frank Yuan, CEO at ASAP Property and a corporate designee for Sky Harbor, testified that the seller was responsible for remediating some mold identified in the guest rooms prior to the sale. Dkt. 240-26 at 84:16-85:2; *id*. at 145:18-24; Dkt. 240-25 at 195:11-25. And the seller confirmed that it had completed these remediations prior to closing. *See* Dkt. 265-11 at 2. As Christopher Flagg of Crestline testified, "we were told that the mold was remediated by the seller, that we took over a clean hotel." Dkt. 240-11 at 139:11-12; *see also id.* at 140:19-141:7.

While operating the Hotel, Plaintiffs became aware of minor mold or leak issues, such as bathwater or air-conditioning issues, of the sort that could be addressed through regular maintenance. Dkt. 240-25 at 71:1-72:25. For example, Frank Yuan testified that monthly reports by

maybe it's not mold specific, but where they fixed the property and had it up to date.").

Hotel managers would sometimes indicate that there was a leak or spot of mold in one room or another and that they had taken care of it. *Id.* He also testified that he was aware of a few problems, such as faucet or toilet leaks that may cause mold if left unchecked but considered these "regular maintenance" issues. *Id.* at 108:24-109:3.

Based on his experience with hotels, Frank Yuan knew that there would always be "some mold," but nothing remotely of the "magnitude" later discovered at the Hotel during the 2015 renovation. *Id.* at 109:5-110:18. He testified that the extent and nature of the roof leaks became evident only when he visited in October 2015 and "saw the water pouring down from the roof . . . to the first floor." *Id.* at 100:2-9; *see also id.* at 79:15-81:12.

Marcy Adams, the Hotel's General Manager, likewise testified that she didn't know of any systemic problems with the Hotel before the 2015 renovation. Dkt. 240-02 at 40:11-23. She had no indication that mold was a problem throughout the Hotel or even "in certain specific areas." *Id.* at 31:25-32:2. For example, she did not know the exterior brick was leaking until after the interior drywall was removed for renovation. *Id.* at 50:6-51:23. She also testified that, prior to the

September 2015 renovation, Crestline did not know that there was mold in the fan coil units, in or beneath the carpets, or in the bathroom fixtures. *Id.* at 28:23-31:12, 61:11-14. To the extent that there had been occasional reports of mold prior to the renovation, management had been able to resolve these "sporadic" problems and identify and fix the "case-by-case" causes, such as pinhole leaks in pipes or a toilet overflow. *Id.* at 30:4-16.

### *The 2015 renovation reveals extensive recent water intrusion, water damage, and mold*

In September 2015, Plaintiffs began renovating the Hotel. During this process, they discovered extensive mold behind the vinyl wallpaper in the guest rooms on the ninth and tenth floors. Dkt. 240-25 at 73:15-23, 98:15-102:8.  Plaintiffs also learned of roof, plumbing, and exterior leaks that appeared to have caused the mold and water damage to the Hotel. *Id.*

Plaintiffs retained third-party Liberty Building Forensics Group ("Liberty") to investigate the causes and extent of the water leaks and mold. Dkt. 240-25 at 81:1-83:15; Dkt. 239-16 at 27. Liberty's 31-page report details the water damage the Hotel sustained "during recent

rainwater events," including a significant storm on August 22 and 23, 2015. Dkt. 239-16 at 27.

> Liberty observed water intrusion through the building envelope while onsite and when these areas were tested. It is Liberty's opinion that this water intrusion occurred during recent rainwater events. One such event occurred on August 22 and 23, 2015.

*Id.* As noted above, a Sky Harbor witness had also seen water pouring into the Hotel in October 2015 through the roof. *Supra* at 6. And, while on site, Liberty observed additional rain and water vapor intrusion in November 2015. Dkt. 239-16 at 8.

Liberty ultimately concluded that water leaks "through the no-hub piping system for the rainwater drains," "through the brick and glazing façade," and "through the roof penetrations occurred while Liberty was onsite and would have occurred during events like the one documented on August 22 and 23 …. These leaks have damaged adjacent areas including the wallboard, insulation, and framing systems. These damages necessitate the removal and repair of these areas as a result of recent leaks and damage." Dkt. 239-16 at 33.

Liberty further concluded that "water vapor intrusion through the brick and glazing facade occurred over the cooling season during July

2015 … result[ing] in water damage to adjacent areas including the wallboard, insulation and framing systems. This mechanism of damage acted in combination with rainwater intrusion throughout the exterior cladding to cause damage in some areas." *Id.*; *see also id.* at 32.

Consistent with this report, Liberty's president testified that the Hotel's exterior sheathing was damaged by rainwater and other water intrusion caused by the August 2015 rainfall event and that there was "additional damage" to the interior sheathing of the Hotel during the summer of 2015. *See* Dkt. 240-10 at 237:3-14; *id.* at 233:3-244:12.

In other words, Liberty documented significant rainwater and water vapor intrusion into the Hotel in 2015, well into the coverage period that starting in late 2013. Liberty's report details the millions of dollars of repairs necessary to remediate the damage caused by these intrusions. Dkt. 239-16 at 10, 34-37.

### *AFM investigates the claims and denies coverage*

Plaintiffs' insurance broker notified AFM of their claims on September 21, 2015. Dkt. 239-1 at 5. The next day, an AFM adjuster, along with a hired consultant from Engineered Solutions Incorporated (ESI), went to the Hotel to investigate the damage.

Crestline submitted a signed and sworn Proof of Loss on February 11, 2016. Dkt. 237-10 at 4; Dkt. 239-16. That same day, AFM sent Crestline a letter advising that AFM needed additional information and documentation to complete its coverage evaluation. Dkt. 239-13 at 11-12. Sky Harbor submitted its Proof of Loss on March 11, 2016. Dkt. 239-13 at 13. Plaintiffs attached a copy of Liberty's report with the Proofs of Loss they submitted to AFM. Dkt. 239-16 at 7.

On March 30, 2016, AFM wrote to confirm receipt of Plaintiffs' Proofs of Loss. Dkt. 239-23 at 14. AFM indicated that "further information will be needed before we can respond to either Proof of Loss" and requested an extension of time to respond. *Id.* Plaintiffs complied with AFM's requests for additional information. *Id.* Throughout spring 2016, AFM continued to request further information and conducted multiple site visits to inspect the Hotel as additional floors were being renovated. *Id.* On May 20, 2016, AFM rejected the Proofs of Loss. *Id.* at 15, 52-54.

Despite denying the Proofs of Loss, AFM continued to investigate Plaintiffs' claim, including visits to the Hotel in June and July of 2016. *Id.* at 16. In late June, AFM informed Plaintiffs that it was exercising

its right to take Examinations Under Oath and to examine pertinent documents. *Id.* AFM conducted these examinations in fall 2016. *Id.*

AFM confirmed its denial of coverage by letter dated January 6, 2017, asserting that no specific event had caused the losses, that most of the losses were excluded under the policy, and that the losses had developed over time and prior to the effective date of the policy. Dkt. 237-14 at 1-2. Plaintiffs filed suit. Dkt. 1.

### *The Policy language*

AFM's Policy "insures against *all* risks of direct physical loss or damage to insured property *except as excluded* under this policy." Dkt. 237-3 at 15 (emphasis added); *see also* 239-5 at 15; 239-6 at 15. As quoted in AFM's denial letter, the Policy excludes two categories of perils. Dkt. 237-14 at 4-5. The first group of perils—Group I—is an absolute exclusion. *Id.* at 4. That is, losses resulting from those perils (*e.g.*, nuclear reaction) are "excluded regardless of any other cause or event whether or not insured under this policy that contributes concurrently or in any sequence to the loss or damage." *Id.* The second category of excluded perils—Group II—are limited by what is sometimes known as an "ensuing loss" or "resulting loss" clause. *Id.* at

5. That is, Group II perils are covered only to the extent that those perils cause direct physical loss or damage, in which case the "resulting direct physical loss or damage is covered." *Id.*

The Policy classifies "latent defect" and "defects in materials, faulty workmanship, faulty construction or faulty design" as Group II perils. *Id.* So there is no coverage for such defects except to the extent that they cause "direct physical loss or damage." Dkt. 237-3 at 31 (2013 policy); *see also* 239-5 at 15; 239-6 at 15. In that case the "resulting direct physical loss or damage is covered" even though the cost of correcting the underlying defect itself is not. *Id.* AFM admits as much in its summary judgment briefing:

> The Policies do not insure against loss or damage caused by "wear and tear, deterioration, depletion, rust, corrosion, erosion, inherent vice, latent defect" or "defects in materials, faulty workmanship, faulty construction or faulty design." *If direct physical loss or damage insured by the Policies results from these conditions, however, then that resulting direct physical loss or damage is covered*.

Dkt. 238-1 at 34 (emphasis added).

In other words, AFM's policy doesn't cover the cost of correcting a construction or design defect that allows water to enter the Hotel. But if that water damages the carpet in the room below, the cost of repairing

or replacing the damaged carpet is covered as a resulting loss. Likewise, if that water damaged "the wallboard, insulation, and framing systems" of the Hotel, as Liberty concluded[11], then the cost of repairing that damage is covered.

The Policy classifies mold as a Group I peril "except as provided in Section D., Extensions of Coverage, Item 18." Dkt. 237-3 at 30 (2013 policy); *see also* Dkt. 237-5 at 37; Dkt. 237-6 at 40. Item 18, in turn, extends the Policy to cover mold damage resulting from physical loss or damage to the Hotel up to a $1 million sub-limit. Dkt. 237-3 at 25 (2013 policy); *see also* Dkt. 237-5 at 42; Dkt. 237-6 at 45. "This coverage includes any cost or expenses to clean up, remove, contain, treat, detoxify or neutralize fungus, mold or mildew from the insured property resulting from such loss or damage." *Id.* Thus, if mold resulted from direct physical loss or damage (through water infiltration, for example), the costs of removal and remediation are covered.

AFM's Policy contains no general coverage limitation or exclusion for losses caused by an underlying condition (such as a design defect)

---

[11] Dkt. 239-16 at 33.

that existed before the Policy period. Nor, as the district court acknowledged, does it contain any general coverage limitation or exclusion for losses that began before the Policy period. Dkt. 259 at 8. Instead, the Policy enumerates two—and only two—perils for which no resulting losses are covered if the peril began before the Policy period. Specifically, the Policy provides that it does not cover losses caused by earth movement or flood[12] "*commencing before* the effective … date and time of this policy."[13]

### *The summary judgment ruling*

The district court granted AFM's summary judgment motion, concluding that there was no coverage for any of Plaintiffs' losses. The court acknowledged "that the policies do not specifically state that losses incurred prior to the policy period are excluded." Dkt. 289 at 8. But the court decided that there was no coverage because "[t]he

---

[12] Lest there be any confusion, "flood" is defined in the Policy and relates to water, spray, and pressure events from a "body of water," not rain or water vapor. *See* Dkt. 237-3 at 40. The water and mold issues here are not traceable to a "flood" event, nor does AFM argue for such an exclusion. *See generally* Dkt. 237-14 (denial letter) & Dkt. 238-1 (AFM's summary judgment brief).

[13] Dkt. 237-3 at 16 (2013 policy); Dkt. 237-5 at 23 (2014 policy); Dkt. 237-6 at 26 (2015 policy) (emphasis added).

undisputed evidence shows that the origin of the water intrusion was the result of defects existing since the original construction of the Hotel." *Id.* at 9. Because the water intrusion was caused by defects that existed before the Policy, the district court concluded "that there was no actual change to the condition of the Hotel which was occasioned by an accident, external or other fortuitous event." *Id.*

Based on that reasoning, the court held that none of Plaintiffs' claimed losses were covered. *Id.* at 9-10. And, relying solely on this no-coverage holding, the court also granted summary judgment for AFM on Plaintiffs' bad faith claim under O.C.G.A. § 33-4-6(a). *Id.* at 11.[14] The court entered final judgment on all claims by all parties. Dkt. 290. This appeal followed.

## STANDARD OF REVIEW

"We review *de novo* the district court's grant of a motion for summary judgment, considering all of the evidence and the inferences it

---

[14] The district court also granted summary judgment for Plaintiffs on AFM's counterclaims for fraud and conspiracy, which essentially allege that Plaintiffs filed an insurance claim despite supposedly knowing that they had suffered no covered losses. The court concluded that because AFM had engaged in its own extensive investigation, it did not justifiably rely on any supposed misrepresentation by Plaintiffs.

may yield in the light most favorable to the nonmoving party." *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005). Likewise, "[t]he construction of an insurance contract is a question of law the Court reviews *de novo.*" *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 773 n.7 (11th Cir. 2011).

The parties and district court agree that Georgia law governs this insurance claim for damage to a Georgia hotel.[15] "Under Georgia law, insurance policies are liberally construed in favor of coverage, and the conditions and provisions of contracts of insurance will be strictly construed against the insurer who prepares such contracts. Thus, while coverage provisions are construed broadly in favor of the object to be accomplished exclusions in an insurance policy are ... interpreted narrowly, in favor of the insured." *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 304 Ga. App. 314, 320 (2010) (citations and internal punctuation omitted).

That is particularly true for the all-risks policy here: "'the insurer, having affirmatively expressed coverage through broad promises,

---

[15] *See, e.g.*, Dkt. 238-1 at 10 n.1 (AFM's summary judgment brief); Dkt. 289 (summary judgment order applying Georgia law).

assumes a duty to define any limitations on the coverage in *clear and explicit* terms.'" *Western Pacific Mut. Ins. Co. v. Davies*, 267 Ga. App. 675, 680 (2004) (citation omitted, emphasis added). "[A]n exclusion sought to be invoked by the insurer will be liberally construed in favor of the insured and strictly construed against the insurer when it is not clear and unequivocal …." *Id.*; *see also Lunceford v. Peachtree Cas. Ins. Co.*, 230 Ga. App. 4, 4–5 (1997).

## SUMMARY OF ARGUMENT

The district court erred in determining, as a matter of law, that AFM's all-risks Policy covers none of Plaintiffs' losses. The court believed that those losses were barred because the water that caused physical damage and mold contamination was able to enter the Hotel due to original design and construction defects that predated the Policy. The court did not base that conclusion upon any Policy language limiting or excluding coverage for physical loss and damage if caused by a pre-Policy defect. There is no such language, although there is an exclusion for two specific perils *not* at issue here that forecloses any coverage if the peril commenced before the Policy period.

As noted above, the Policy's Group II exclusion for design and construction defects maintains coverage for any physical loss or damage to the insured structure resulting from those defects. And, although nominally a Group I peril, mold that results from physical loss of damage to the Hotel is covered up to $1 million. And AFM sold Plaintiffs this Policy to ensure an existing structure long after its original design and construction. Its Policy says nothing about excluding physical loss or damage caused by design and construction defects if (as one would expect) those defects had existed before the Policy issued—indeed, since the Hotel was built. If that's what AFM intended, it had "a duty to define any [such] limitations on the coverage in clear and explicit terms.'" *Western Pacific*, 267 Ga. App. at 680. It did not.

Instead of policy language, the district court based its coverage ruling upon a single case—*AFLAC Inc. v. Chubb & Sons, Inc.*, 260 Ga. App. 306 (2003). *AFLAC* held that an insured property owner suffered no physical loss or damage when it incurred costs to fix a programming defect in its computers (a lack of Y2K compatibility). That programming defect had not caused any physical damage to the computer or any of

the insured's property. Instead, the insured's only purported loss was the cost of pre-emptively fixing that defect before it caused any damage.

The district court erred in thinking that *AFLAC*—a case where the defect caused no physical loss or damage—governed this case. *AFLAC* does not foreclose recovery for an insured—like Plaintiffs here—who has suffered actual physical loss or damage resulting from a pre-Policy defect.

Plaintiffs do not contend they can recover the cost of correcting the underlying design or construction defects that allowed water to enter the Hotel. But they do seek to recover the costs of repairing the physical loss and damage *caused by* that infiltrating water, such as the extensive damage to the Hotel's wallboard, insulation, framing systems, and other areas documented by Plaintiffs' expert consultants. As the Northern District of Georgia explained in another hotel mold case, "even if defective design or faulty workmanship contributed to the growth of mold, damage to the [hotel's] ventilation system, air conditioners, walls, wall coverings, or the exhaust system is 'resulting damage' that is covered by insurance." *NUCO Invs., Inc. v. Hartford Fire Ins. Co.*, 2005 WL 3307089, at *5 (N.D. Ga. Dec. 5, 2005). The same is true here.

This case would be like *AFLAC* if Plaintiffs were seeking to recover solely the costs of correcting the underlying defects, rather than the property damage that resulted from them. The former isn't covered, but the latter is, just as AFM admits in its summary judgment briefing. *See* Dkt. 238-1 at 34 (quoted above at 12). In short, *AFLAC* did not involve any resulting direct physical loss or damage. This case does.

The district court did not base its coverage holding on the presence of some water or mold in the Hotel prior to the Policy period. But that rationale could not sustain summary judgment either. No Policy language excludes loss or damage suffered before the Policy period. No Policy language excludes loss or damage suffered during the Policy period if similar loss or damage occurred before the Policy Period. In other words, nothing in the Policy says that if there is a patch of mold or a single rainfall intrusion before the Policy, any mold or damage later caused by water intrusion during the Policy isn't covered. Again, any such "limitations on the coverage" would have required "clear and explicit terms.'" *Western Pacific*, 267 Ga. App. at 680.[16]

---

[16] "Any and all ambiguities in an insurance contract shall be construed most favorably toward the insured and most strongly against the insurer. This is particularly true where construction of an

As recited above, there is ample evidence of significant rain and water vapor intrusion during the Policy period, particularly in 2015, causing extensive damage to the Hotel. And, to the extent it matters under the law, there is substantial evidence that Plaintiffs did not know of or anticipate this type or scope of damage before AFM issued coverage in late 2013. A jury could easily find that Plaintiffs believed that the isolated issues with mold or water that manifested before the 2015 renovation were (1) limited in scope; (2) materially different in cause; (3) remedied before purchase or through routine maintenance after purchase; and (4) not remotely comparable to the damage they discovered in 2015. Indeed, AFM itself had insured and inspected the Hotel when it was still operated by its previous owner. And it did not detect any of the issues that it now claims were existing and obvious before Sky Harbor's 2013 purchase.

Ultimately, the district court should have resolved the coverage questions in this case based on the plain Policy language. Instead, it accepted AFM's invitation to infer unwritten coverage limitations and

---

exemption or exclusion is at issue." *Broome v. Allstate Ins. Co.*, 144 Ga. App. 318, 319 (1977) (citations and punctuation omitted).

exclusions supposedly implied by the nature of an all-risk policy, or the concepts of "risk" and "fortuity." This Court should reverse the district court's no-coverage holding, along with its derivative grant of summary judgment on Plaintiffs' claim for bad faith denial of coverage.

## ARGUMENT AND AUTHORITIES

**I.    The Policy covers physical loss and damage to the Hotel even if it resulted from construction or design defects that existed since the original construction.**

**A.    No Policy language limits or excludes coverage for physical loss or damage resulting from a pre-Policy defect in construction or design.**

AFM's Policy "insures against *all* risks of direct physical loss or damage to insured property *except as excluded* under this policy." Dkt. 237-3 at 15 (emphasis added); *see also* 239-5 at 15; 239-6 at 15. To repeat: "all risks … except as excluded."

As AFM concedes, the Group II exclusion for design and construction defects maintains coverage for physical loss or damage resulting from those defects. *Supra* at 12. This language says nothing about excluding physical loss or damage caused by such defects if the defects existed before the Policy period. That would have been a very important thing for an insured to know when purchasing coverage for

an existing structure. And it would have been an easy limitation for AFM to express, if that was what it intended. If AFM desired such a limitation, it had the duty to express it "in clear and explicit terms." *Western Pacific*, 267 Ga. App. at 680.

The absence of *any* such limitation, let alone a clear and explicit one, makes this an easy case. "[T]he conditions and provisions of contracts of insurance will be strictly construed against the insurer who prepares such contracts." *Barrett*, 304 Ga. App. at 320. The coverage limitation that AFM seeks to enforce is not in the Policy language, and that should have been the end of the inquiry.

Moreover, "[i]n construing an insurance policy, the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." *Cincinnati Ins. Co. v. Davis*, 153 Ga. App. 291, 295 (1980). As AFM acknowledges, its policy covers physical loss or damage to the property resulting from "latent defect" or "defects in materials, faulty workmanship, faulty construction or faulty design." *Supra* at 12. A reasonable insured buying insurance to cover an existing building would not assume that loss or damage to the structure falls outside

coverage if it resulted from a construction or design defect that existed

before the Policy period. By their nature, most design and construction

defects originate before or during construction, even if they do not cause

damage for years afterwards. If AFM wanted to exclude coverage for

losses resulting from pre-Policy defects, it had to say so clearly.

**B. The phrase "direct physical loss or damage" does not implicitly bar recovery for losses resulting from pre-Policy defects.**

The district court relied upon one case—*AFLAC Inc. v. Chubb &*

*Sons, Inc.*, 260 Ga. App. 306 (2003)—to conclude that the Hotel suffered

no direct physical loss. Dkt. 289 at 9-10. Specifically, the court held that

there was no change to the Hotel during the Policy period because the

underlying construction and design defects that later allowed water to

infiltrate the Hotel had existed since its original construction. That fact,

in the district court's view, precluded coverage. *Id.* at 9.

However, Plaintiffs do not seek to recover for the costs of

correcting the underlying defects that allowed water to infiltrate the

Hotel. Instead, Plaintiffs seek coverage for the direct physical loss and

damage to the Hotel as a result of that infiltration of water. As

explained above, that is precisely the balance struck by AFM's policy.

The costs of correcting bad construction or design are not covered, but "[i]f direct physical loss or damage insured by the Policies results from these conditions … then that resulting direct physical loss or damage is covered." Dkt. 238-1 at 34 (AFM's summary judgment brief).

In other words, this Policy insures against the risk that a defect in the original design or construction of the Hotel would later result in physical loss or damage to the structure. That's what an insured expects even in a routine homeowner's policy—if the homebuilder's long-ago failure to properly seal the chimney later allows rainwater to enter the house and damage the interior ceiling and walls, then insurance should cover the costs of repair (even if it won't cover the costs of sealing the chimney). That's what happened here. Original construction and design problems allowed rain and water vapor to enter the Hotel, damaging the wallboard, insulation, framing systems, and other aspects of the structure.

In *AFLAC*, the insured sought to recover the expenses associated with converting its computer software to four-digit date recognition in anticipation of Y2K. 260 Ga. App. at 306. AFLAC embarked on a remediation effort to preempt any problems. *Id.* at 308. In other words,

AFLAC fixed the defect *before* it caused any physical damage or loss and sought to recover the costs of doing so.

The court rejected AFLAC's insurance coverage claim, determining that there was "[n]o change in such systems as evidenced by direct physical loss of or damage thereto as a result of a fortuitous event." 260 Ga. App. at 308–09. AFLAC's claim was appropriately denied because there was no change—indeed no damage of any kind—to its systems or structures. It sought only "maintenance and renovation expense[s]" to upgrade its technology in advance of an event that may or may not have caused physical damage in the future. *Id.* The expenses incurred to update the software coding could not be categorized as covered losses because, when those funds were spent, there was no physical damage to the computer. *Id.*[17]

So in *AFLAC* there was no ensuing physical damage or loss resulting from the software defect, only the cost of upgrading the

---

[17] In applying *AFLAC*, this Court too has held that "direct physical loss" requires that the insured property have suffered some sort of *physical* effect. *See Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021).

software. It would be as if the Plaintiffs here had discovered and remediated all construction and design defects before water entered the Hotel and were seeking coverage only for the costs of remediating those defects. That's not the case.

The central holding in *AFLAC* (and the cases upon which it relies) is that an insured must have suffered some sort of *physical* damage or loss. *ALFAC* built upon the Fifth Circuit's decision in *Trinity Industries v. Insurance Co. of North America*, 916 F.2d 267, 271 (5th Cir. 1990). *Trinity* involved an all-risk insurance policy issued to a shipbuilder. *Id.* The shipbuilder sought coverage for sums it paid to satisfy an arbitration award for the costs of repairing a twist in the hull, a defect that the shipbuilder knew existed when it sold the ship. *Id.* There was no coverage because the ship "was unchanged in any aspect by the arbitration award" and the insured could not point to any *physical* consequence that could be traced to the defect. *Id.* Just as in *AFLAC*, there was no ensuing physical damage resulting from the defect, only the cost of repairing the defect itself.

As the Fifth Circuit recognized in *Trinity*, there is a difference between an insured seeking coverage for the expenses associated with

29

repairing defective workmanship and cases in which the insured seeks coverage for subsequent losses occasioned by defective workmanship. *Id.* at 270. If the defective workmanship causes the property to be destroyed or damaged, the insured may not recover the costs to correct the defect, but the insured is covered for the "cost to rebuild the structure in its defective state." *Id.*

By way of example, had AFLAC's computer been damaged by overheating as it struggled to interpret two-digit dates in the new millennium, then the cost to repair or replace the computer would have been covered, even though the programming defect had existed since the software was created. And had the ship in *Trinity* taken on water at sea because of the twist in its hull, any resulting water damage to the ship's deck or internal systems would have been covered.

Here, the Hotel suffered extensive damage from water infiltration during the Policy period, which is, without a doubt, a form of physical damage.[18] The water damage was caused by external events, namely

---

[18] For example, Brian Cook, Staff VP & Senior Adjuster for AFM, testified that "damage from water is a covered risk" and if water "contacts undamaged property, it damages it." Dkt. 240-05 at 120:8-10, 160:16-25.

atmospheric changes and water intrusion from rainstorms. That such intrusions were made possible by defects that existed since the construction of the Hotel does not preclude coverage for the damage that those defects allowed. The coverage-triggering change in the Hotel's condition was not the underlying defects, but the extensive damage to the wallboard, insulation, framing systems, and other portions of the structure caused by water infiltration during the Policy period.

Thus, Plaintiffs do not, as the district court wrongly believed, "seek insurance proceeds to cover the 'ordinary cost of doing business,' that is, maintenance and renovation expenses." Dkt. 289 at 9-10 (quoting *AFLAC*, 260 Ga. App. at 309). That *is* what AFLAC was doing, in attempting to recover the cost of upgrading its computers, rather than costs of repairing some physical loss or damage caused by the programming defect. But it is not what Plaintiffs are doing here. They seek coverage for the physical loss or damage caused by underlying construction and design defects, rather than the cost of correcting those defects.

Multiple court decisions illustrate how an all-risk policy applies to physical loss or damage resulting from a construction defect. *See, e.g.*, *NUCO*, 2005 WL 3307089, at \*5; *Buscher v. Economy Premier Assur. Co.*, 2006 WL 268781 (D. Minn. 2006); *McGrath v. Am. Family Mut. Ins. Co.*, 2008 WL 4531373 (N.D. Ill. 2008); and *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 444, 454 (W.D. Ky. 2007).

*Nuco* is particularly on point. The property insurer refused to cover any of the costs associated with mold damage at a hotel, based on a coverage exclusion for faulty design or construction. Applying Georgia law, a different judge of the Northern District of Georgia rejected the insurer's position, reasoning that

> even if design or workmanship problems were found to be a proximate cause of the mold damage for which NUCO seeks recovery, under the plain language of the Policy, NUCO can recover damages for loss or damage *resulting from* defective design, faulty material, and faulty workmanship. In other words, had NUCO filed a claim prior to the growth of mold seeking replacement of the ventilation system, air conditioners, walls, wall coverings, or the addition of a totally new exhaust system because these items were defectively designed, this claim would be barred by the exclusion at issue here. But, as the Policy clearly states, resulting damage is covered.

2005 WL 3307089, at \*5 (emphasis added). "Thus, even if defective design or faulty workmanship contributed to the growth of mold,

damage to the ventilation system, air conditioners, walls, wall coverings, or the exhaust system is 'resulting damage' and is not excluded by the plain language of the Policy." *Id.*

*Buscher* involved a policy that insured against "actual accidental physical loss or damage to property," with an exclusion for loss caused by faults in construction material. 2006 WL 268781. The insured homeowners suffered water damage to their closet ceiling, insulation, sheetrock, wall paint, baseboard, and carpet due to water leakage. *Id.* The insurer determined that the water leakage resulted from a construction defect in the chimney flashing. *Id.* The homeowners also conducted moisture testing and determined that there was extensive water and mold damage to the interior wall assembly, which was the result of rain and snow penetrating the exterior building envelope. *Id.*

The *Buscher* court held that the water damage to the home constituted "actual accidental physical loss or damage." *Id.* at *4. The court also held that the policy's construction defect exclusion "does not exclude water damage *resulting from* a construction defect." *Id.* at *5 (emphasis added). While the construction defect exclusion may bar the portion of the homeowner's claim for the costs of repairing the flashing

and fixing the exterior envelope, it did not bar all losses resulting from construction defects. *Id.*

The court reached a similar conclusion in *McGrath*. The homeowners sought coverage under an all-risks policy for water damage to their dry wall and insulation. 2008 WL 4531373. Their insurer denied coverage, asserting that the water damage resulted from construction or design defects in the walls that allowed water to infiltrate the building. *Id.* The court rejected the insurer's position, finding that the policy's construction and design defects exclusion did not bar coverage for loss from "moisture intrusion that occurred *as a result* of construction or design defects." *Id.* at *6 (emphasis added). Instead, the exclusion barred only the costs of correcting the defects themselves.

Finally, in *Eckstein*, 469 F. Supp. 2d 444, the court held that a construction-defect exclusion did not preclude coverage for losses caused by leaks in a defective roof. The court recognized that "water damage ensuing from a defective roof is covered as an ensuing loss, but the exclusion for faulty construction excludes coverage to repair the roof." *Id.* at 454.

As in *Nuco*, *Buscher*, *McGrath*, and *Eckstein*, the construction and design defect exclusion here does not bar coverage for water damage to the Hotel that results from improper design, installation, or construction. Furthermore, AFM's policy goes further than the policy language at issue in *Buscher* and *McGrath*, making this case particularly easy. AFM's policy includes affirmative language confirming that "resulting direct physical loss or damage [caused by construction or design defects] is covered." *Supra* at 12.

In sum, the district court erred by holding that AFM's policy does not cover direct physical loss or damage that results from pre-Policy construction or design defects. The Policy doesn't say that, and neither does Georgia law.

## II.    The Policy does not bar coverage for direct physical loss or damage if it occurred or started before the Policy period.

The district court expressly based its summary judgment ruling on the fact that "the origin of the water intrusion was the result of defects existing since the original construction of the Hotel." Dkt. 289 at 9. As addressed above, that was error. And, for three reasons, the district court's ruling cannot be affirmed based upon the presence of some pre-Policy water or mold damage at the Hotel.

First, the Policy language does not limit or exclude coverage for costs the insured incurs during the Policy period to repair physical damage that occurred before the Policy period.

Second, Georgia has not adopted an implied exclusion for losses already known to the insured prior to the policy inception. But even jurisdictions recognizing such a "known loss" doctrine do not apply it to losses that the insured discovers during the policy period. Based on the evidence, a jury could easily find that that is what happened here.

Third, even if Plaintiffs couldn't recover the costs for repairing any damage the Hotel suffered before the Policy period, they could recover for repairing the significant damage suffered *during* that period—in particular, the effects of the 2015 summer and fall storms and water vapor infiltration described in Liberty's report. The Policy excludes damage from conditions that commenced before the Policy period only in two specific circumstances, neither applicable here. So the Policy cannot properly be read to exclude coverage for other types of losses on the ground that they commenced to some degree before the Policy issued.

### A. The Policy language does not limit or exclude coverage for costs incurred during the Policy period to repair physical damage that occurred before the Policy period.

The district court recognized that AFM's Policy "do[es] not specifically state that losses incurred prior to the policy period are excluded." Dkt. 289 at 8. Since coverage exclusions must be clear and explicit, that should have ended the inquiry. An unstated limitation is not a limitation.

"Under Georgia law, an insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law, and it is equally free to insure against certain risks while excluding others." *Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc.*, 266 Ga. 260, 262 (1996). So nothing precludes an insurer from covering costs that an insured incurs during the policy period to repair damage that occurred before coverage commenced.

Some Georgia cases have involved policies that expressly limit coverage to damage caused by some occurrence or accident *during the policy period*.[19] Other policies expressly cover "property damage only

---

[19] *See, e.g., Calabro v. Liberty Mut. Fire Ins. Co.*, 253 Ga. App. 96, 97 (2001) (policy "required that property damage result from an

when 'prior to the policy period, no insured ... knew that the ... 'property damage' had occurred, in whole or in part.'"[20] But AFM's Policy contains no such requirements or limitations. And, as explained above, the district court misread the one case (*AFLAC*) upon which it relied to infer such an implicit requirement.

Thus, particularly when "liberally construed in favor of coverage,"[21] AFM's Policy must be read to cover costs its insured incurs during the Policy period to repair physical loss or damage, even if that loss or damage occurred before the Policy was effective.

### B.   Georgia has not recognized an implied exclusion for losses known to the insured before the Policy period.

Georgia law is clear: any exclusions to coverage must be clear and explicit, rather than implied. *See, e.g.*, *Lunceford*, 230 Ga. App. at 4–5;

---

accidental occurrence during the policy period"); *Columbia Cas. Co. v. Plantation Pipe Line Co.*, 338 Ga. App. 556, 558-559 (2016) ("This policy applies to injury or destruction taking place during this policy period. . ."); *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F.Supp.2d 1340, 1349 (N.D. Ga. 2001) ("This insurance applies to 'bodily injury' and 'property damage' only if: . . . . [it] occurs during the policy period.").

[20] *Essex Ins. Co. v. H & H Land Dev. Corp.*, 525 F. Supp. 2d 1344, 1345 (M.D. Ga. 2007) (quoting policy).

[21] *Barrett*, 304 Ga. App. at 320.

*Great Am. All. Ins. Co. v. Anderson*, 847 F.3d 1327, 1331-32 (11th Cir. 2017). Georgia's Court of Appeals has observed that, although accepted in some jurisdictions, Georgia has not recognized an implicit exclusion based on an insured's knowledge of pre-existing damage, also referred to as the "known loss" doctrine.[22] That observation came long after the *AFLAC* decision on which the district court relied.

A federal court should not impose "known loss" and related doctrines to limit the rights of a Georgia insured when Georgia has not done so. *See, e.g.*, *Caribbean I Owners' Ass'n, Inc. v. Great Am. Ins. Co. of New York*, 600 F. Supp. 2d 1228, 1247 (S.D. Ala. 2009) (declining to impose related "expected loss," "loss in progress," "known loss," and "fortuity" doctrines to bar insurance claim when the governing Alabama law had not recognized those doctrines).

**C.    Applying any "known loss," "expected loss," or "fortuity requirement" here would depend on issues of disputed fact.**

Some jurisdictions require that a loss must be "fortuitous" to be covered. That "fortuity requirement" is closely related to, perhaps

---

[22] *Columbia Cas. Co. v. Plantation Pipe Line Co.*, 338 Ga. App. 556, 564 (2016) (physical precedent only).

synonymous with, the "known loss" doctrine. *See, e.g.*, 43 Am. Jur. 2d Insurance § 469. Even in jurisdictions where the fortuity requirement applies, it does not bar coverage if the loss is not known or expected when the policy commences. Indeed, AFM acknowledged below that a requirement that the Hotel's losses must be "fortuitous" does not bar coverage if the loss is unknown or unexpected when the policy commences.[23]

The most commonly adopted fortuity doctrine is from the First Restatement of Contracts.[24] Indeed, this Court has applied the Restatement's definition of fortuitous when interpreting contracts under Florida law.[25] The Restatement defines a fortuitous event as one "dependent on chance." *Id.* (quoting Restatement of Contracts § 291, cmt. a (1932)). Importantly, though, it can include pre-policy events

---

[23] Dkt. 238-1 at 21 ("Most courts, as well as the First Restatement of Contracts, adhere to the view that a loss is fortuitous if neither party knew or contemplated there was a defect in the insured property at the time the insurance contract was issued.") (quoting *Atl. Mut. Ins. Co. v. Lotz*, 384 F. Supp. 2d 1292, 1298 (E.D. Wis. 2005)).

[24] *See Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 814–19 (9th Cir. 2019).

[25] *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 431 (5th Cir. 1980).

provided that "the fact is unknown to the parties." *Id.* The inquiry is not whether a pre-existing defect would inevitably cause damage, but what the parties knew and expected when they entered the insurance contract. *Id.*; *see, e.g., City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 49 (2d Cir. 2003).

Thus, even if there is an implied fortuity requirement, the question would not be whether the defects that had existed since the Hotel was built would inevitably cause problems. The question is what the parties knew and expected. Here, the district court did not find an absence of any fact dispute as to what the parties knew about the Hotel's condition and when they knew it; instead, the court wrongly thought it dispositive that the parties have *now* determined that much of the damage was ultimately attributable to defects that existed prior to the Policy. *See* Dkt. 289 at 8 n.1 & 9.

On this record, what the parties knew and expected about the defects and damage to the Hotel when the Policy issued presents disputed questions of fact. The evidence would allow a reasonable jury to find that Plaintiffs did not know of pre-Policy defects or damage that

would preclude any recovery under the Policy. That evidence is recounted above, pp. 6-9, but to summarize:

First, Plaintiffs reviewed numerous pre-purchase reports that the Hotel was in good condition, and that any reported problems were consistent with regular maintenance issues. The AEI report, the CERES report, and the PKF report all found that the Hotel was in a satisfactory condition. To the extent that AFM relies on earlier reported problems of mold from 2003, that was in a different area of the Hotel than the extensive damage to the guestroom tower and there is evidence that the seller had remediated those issues prior to the 2013 sale, and more important to any known-loss or fortuity requirement, that the Plaintiffs expected and believed that to be true.[26]

Second, there is evidence that the substantial damage and mold discovered during the renovation was the result of *2015* water vapor and rain intrusions. That was certainly the conclusion of Liberty, the

---

[26] Moreover, Crestline is the expressly named insured, and there is no evidence that Crestline saw any prior reports of mold prior to securing the insurance policy. At a minimum, Crestline would be entitled to recover for the Hotel's losses as it did not know of the existence, extent, and nature of the damage at the time the policies were issued.

consultant that evaluated the Hotel in 2015 and 2016 shortly after the discovery of extensive water and mold damage. As detailed above, Liberty concludes that a major cooling season during July 2015 and a severe rainstorm in August 2015 caused the damage it documented in its expert report. Dkt. 239-16 at 27-33.

Third, there is evidence that, prior to the Policy period, Plaintiffs had not discovered anything like the extensive water intrusion, damage, mold revealed by the 2015 renovation. Below AFM pointed to testimony that there were occasional problems with leaks or mold. But these occasional problems do not compare to the systemic ones that Plaintiffs discovered during the 2015 renovation, including widespread mold in the walls, floors, and fan units.

It is one thing to learn that isolated pin-hole leaks in pipes or toilets or faucets have led to patches of mold somewhere in a large hotel. It is another thing to see rainwater pouring into the building in 2015 (as did Sky Harbor representative Frank Yuan) or to learn about the systemic defects in the piping system, roof penetrations, and other systems that Liberty blamed for the 2015 water intrusions. *Supra* at 6-9. Plaintiffs presented testimony from both the management and

owners of the Hotel that, before renovation, they were not aware of and did not expect anything at all like the extensive water intrusion, mold, and damage revealed during that process. *Supra* at 6-9.

Rather than somehow conclusively refute this evidence, AFM's witnesses admitted that at least some of the claimed damage may have occurred during the policy periods. For example, AFM adjuster Joel Brown testified that "[i]t is possible for a rain event to be a discrete event" causing a loss. Dkt. 240-4 at 88:8-12. And Chris Dawkins, an engineer for AFM's expert (ESL), admitted that a single rain event could have caused erosion to the caulking on the roof, Dkt. 240-06 at 267:1-12, and that at least some of the leaks could have occurred "during the policy periods." Dkt. 240-7 at 41:15-42:2. Further, AFM could not "identify when the HVAC system went out of balance," causing water vapor intrusion from the outside air. Dkt. 240-4 at 90:25-91:1. As noted above, Liberty concluded that this intrusion occurred in July 2015.

In sum, AFM cannot establish—certainly not for purposes of summary judgment—that the extensive damage underlying Plaintiffs' claims preceded the Policy, rather than being caused by weather

conditions in 2015, as Plaintiffs' evidence indicates. Indeed, AFM's investigating contractor (ESL) never attempted to gather weather data or otherwise refute the indications that the August rainstorm was responsible for significant damage to the Hotel. Dkt. 240-06 at 268:9-269:25.

*Finally*, AFM performed its own inspections of the Hotel prior to issuing the Policy and never identified any of the problems it now claims were known and obvious. Brian Cook, Vice-President of AFM's Special Investigations Unit, testified that before insuring a property, AFM inspects the property to determine whether it is a good risk or bad risk and discuss any "deficiencies" with the insured. Dkt. 240-05 at 108:8-21. Notably, AFM had insured the Hotel *before* its former owners sold the property to Sky Harbor, so it has a longer association with this property than Plaintiffs do.

In 2010, three years *before* Sky Harbor's purchase, AFM conducted a risk evaluation of the Hotel. Dkt. 265-27. Despite a comprehensive inspection and evaluation, AFM's underwriting report did not identify water damage, atmospheric intrusion, or mold problems. *Id.* Later, around February 2014, AFM's field engineer

inspected the Hotel and did not identify or report any of the supposedly obvious structural deficiencies and pervasive water intrusion and mold that AFM claims existed before 2015. Dkt. 265-1 at 21 (PF 41).

In other words, AFM did not discover the problems that had supposedly existed since construction. And AFM markets itself as an engineering-based insurance company, with 180 years of engineering expertise, that deploys 1,800 specially trained engineers to provide on-site evaluations, identify exposures, and conduct location-based engineering underwriting to rate risks. Dkt. 265-31.

On top of this, AFM's parent company, FM, had insured the Hotel at or around the time of the 2003 reports that purportedly identified the existence of water and mold damage. Dkt. 265-26 at 2. Despite this, FM insured the property. *Id.* These facts, too, preclude a ruling that any known loss or fortuity requirement bars all recovery as a matter of law.

**D.    At a minimum, Plaintiffs may recover the costs to repair physical loss or damage that occurred within the Policy period.**

Insurance contracts must be read as a whole, giving effect to each provision and interpreted so that each provision harmonizes with the others. *See AFLAC*, 260 Ga. App. at 307. And it is a well-known

principle of contract interpretation that the express mention of one thing implies the exclusion of another. *Copeland v. Home Grown Music, Inc.*, 358 Ga. App. 743, 748 (2021). So when an insurer uses certain contractual language in one circumstance but not another, that "should be treated as a matter of considered choice." *Flynt v. Life of S. Ins. Co.*, 312 Ga. App. 430, 436 (2011).

As noted above, AFM's Policy explicitly does not cover losses arising from two types of conditions if they began before the Policy issued. Specifically, the Policy does not cover losses caused by earth movement or flood "*commencing before* the effective … date and time of this policy."[27] Given AFM's choice to specify that it would not provide coverage for losses arising from these two conditions if they commenced before coverage, it is wrong to read the Policy as implicitly barring coverage for losses occasioned by any other, non-specified events that may have started or prior to the effective date. The difference in language AFM drafted must be treated as its considered choice.

---

[27] Dkt. 237-3 at 16 (2013 policy); Dkt. 237-5 at 23 (2014 policy); Dkt. 237-6 at 26 (2015 policy) (emphasis added). As noted above, "flood" connotes a body of surface water, rather than rainwater or water vapor entering a structure, and no one contends otherwise. *See supra* at n. 12.

The Policy does not say that the costs to repair loss or damage that occurs within the Policy period are not covered if there were similar losses or damage before. Under that standard, substantial water or mold damage to the structure and contents of the Hotel occurring during the Policy period would be uncovered if there was *any* water or mold in the structure before the Policy commenced. That would create a huge exception to coverage, not expressed in any policy language. Georgia law does not permit a court to infer such an implicit limitation.

Under Georgia law, a jury must resolve disputes over whether and to what extent damage occurred during the period covered by insurance. In *Lipsitz v. Fireman's Fund Insurance Co.*, 183 Ga. App. 270, 270 (1987), the insured's roof collapsed five days after his "all-risk" insurance policy expired. It was for the jury to decide whether the accumulation of ice in the roof that occurred during the policy period caused a serious impairment of structural integrity or whether the rain that occurred after the policy's expiration was the key factor. *Id.*

Likewise, in *Sun Insurance Office, Ltd. v. Guest Camera Store, Inc.*, 108 Ga. App. 339, 345 (1963), the defendant insurer had evidence that "tended strongly to disprove" plaintiff's contention that a

48

windstorm punctured a roof and subsequently allowed rainwater intrusion. That evidence included records that the wind was only 22 mph and an expert report that no more than 12 gallons of water could have entered through the holes allegedly caused by windstorm. *Id.* But these question of whether the windstorm caused the physical damage was for a jury, given competing lay testimony that the wind was blowing very hard and expert testimony that one August storm could cause over 1,800 gallons of water to fall on one half of the roof. *Id.*

Here, as in *Lipsitz* and *Guest Camera*, there are fact questions regarding the extent and amount of recoverable loss. As noted above, Plaintiffs are entitled to the most favorable interpretation of the Policy. But even under the most restrictive reading, they would be entitled to recover the costs to repair physical loss and damage caused by weather events during the policy period, including those from July to November 2015. The district court erred in granting summary judgment on all claims for coverage.

**III. Before reading any unstated coverage limitations into the Policy, the Court should certify the issue to the Georgia Supreme Court.**

The Policy language and existing principles of Georgia law provide everything this Court needs to reverse. Affirmance, by contrast, would make new law. If this Court does not simply reverse the district court's holding that some implied known loss or fortuity requirement excludes coverage here, it should certify that issue to Georgia's highest court.

The interpretation of insurance contracts is "peculiarly a question of state law." *Claussen v. Aetna Cas. & Sur. Co.*, 865 F.2d 1217, 1217 (11th Cir. 1989). Certification to the Georgia Supreme Court is appropriate when "there is no clear precedent in the decisions of the courts of Georgia." *Id.*; *see also* O.C.G.A. § 15-2-9 (allowing certification when there are "no clear controlling precedents in the decisions of the Supreme Court of this state").

There is no Georgia court decision affirmatively and clearly holding that some fortuity doctrine or other inherent feature of an all-risk policy bars coverage under the circumstances here. Therefore, if the Court does not reverse, it should certify a question on the existence and

scope of any such implied exclusions to the authoritative state court, as this Court[28] and other circuit courts have done before.[29]

## IV.  The district court erred in granting summary judgment on Plaintiffs' claim for bad faith denial of coverage.

The district court granted summary judgment to AFM on Plaintiffs' claim for bad faith denial of coverage on the sole ground that there was no coverage as a matter of law. Dkt. 289 at 10-11. Because that no-coverage ruling is error, the Court should reverse the grant of summary judgment on Plaintiffs' bad faith claim as well.

## V.  Sky Harbor is an insured under the Policy for purposes of loss or damage to the Hotel, and Crestline is also a named insured entitled to recover under the Policy.

The district court dismissed Sky Harbor's claims for breach of contract and bad faith, finding that it was not an insured under the Policy. Dkt. 289 at 12. AFM does not dispute that Crestline—which managed the Hotel for AFM—is a named insured. As to Crestline, AFM sought summary judgment on the basis that Crestline had supposedly

---

[28] *See, e.g., Whiteside v. GEICO Indem. Co.*, 977 F.3d 1014, 1022 (11th Cir. 2020) (certifying Georgia insurance law questions to the Georgia Supreme Court).

[29] *City of Burlington*, 332 F.3d at 38 (certifying question regarding interpretation of all-risk policy to the state court).

suffered no damages. Dkt. 238-1 at 4-6, 18-19. Neither of these arguments is any basis to bar recovery.

### A. Sky Harbor is an insured under the Policy for purposes of loss or damage to the Hotel.

The Policy identifies the named insureds as Crestline and "any interest[s] . . . which are owned, controlled or operated by" Crestline. Dkt. 237-3 at 3 (2013 policy); Dkt. 237-5 at 5 (2014 policy); Dkt. 237-6 at 7 (2015 policy). To be sure, Crestline did not own, control, or operate Sky Harbor itself. But as Hotel manager, it indisputably controlled and operated Sky Harbor's *interest* in the Hotel, which is identified as an insured property. Dkt. 237-3. The management contract made Crestline Sky Harbor's "*exclusive agent* to supervise, direct and *control* management and operation of the Hotel." Dkt. 239-09 at 1 (emphasis added). Because Crestline controlled and operated Sky Harbor's interest in the Hotel, Sky Harbor is an insured under the Policy for purposes of any loss or damage to the Hotel.[30]

---

[30] *See* Dkt. 262 at 2, 15-16 (raising this argument in opposition to summary judgment).

The question is not, as the district court thought, merely whether Sky Harbor was a Crestline subsidiary. The Policy defines insureds as Crestline "and its wholly or majority owned subsidiaries *and any interest* … owned, controlled or operated by any one or more of those named insureds." Dkt. 265-3 at 15 (emphasis added); Dkt. 237-5 at 7 (2014 policy); Dkt. 237-6 at 9 (2015 policy). Like any contract, insurance contracts must be read as a whole, giving effect to each provision whenever possible. *See AFLAC*, 260 Ga. App. at 307. So the Court must construe "and any interests" to have meaning different and independent from "wholly or majority owned subsidiaries." And if there were doubt, it would be resolved by the Georgia-law mandate to construe insurance policies liberally in favor of coverage. *Barrett*, 304 Ga. App. at 320.

Moreover, AFM performed the Policy consistent with everyone's understanding that Sky Harbor was an insured. AFM corresponded with Sky Harbor on the claim as an "Additional Named Insured," demanded information and documents from Sky Harbor, and demanded

Sky Harbor's representatives and employees' examinations under oath. Dkt. 265-01 at 25 (PF 48); *see also* Dkt. 265-32 at 4.[31]

In sum, Sky Harbor is a named insured for purposes of losses to the Hotel because Crestline managed its interest in the Hotel and the Hotel is an insured property.

### B. Crestline is also a named insured entitled to the benefits AFM owes under the Policy.

Whether Sky Harbor is an insured is ultimately academic because Crestline is indisputably a named insured, and the Hotel is indisputably an insured property. As an insured with an insurable interest, Crestline may recover whatever payments AFM owes under the insurance contract. *See, e.g.*, *Georgia Farm Bureaus Mut. Ins. Co. v. Franks*, 320 Ga. App. 131, 133 (2013).

"The test of insurable interest in property is whether the insured has such a right, title, *or interest therein, or relation thereto*, that he will be benefited by its preservation and continued existence, or suffer a direct pecuniary loss from its destruction or injury by the peril insured

---

[31] "The construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them." *Scruggs v. Purvis,* 218 Ga. 40, 42 (1962).

against.'" *Am. Reliable Ins. Co. v. Woodward*, 143 Ga. App. 652, 653 (1977) (emphasis added). "[H]aving title or legal ownership is not the sine qua non of having an insurable interest, so long as the insured has some lawful interest which may be slight or contingent, legal or equitable." *Franks*, 320 Ga. App. at 133–39.

As property manager, Crestline had a direct economic interest in the preservation and continued existence of the Hotel. "[O]nce any insurable interest is shown to exist, . . . it is the policy at issue . . . that determines the amount the insured is entitled to recover." *Franks*, 320 Ga. App. at 134-39. The policies fix loss at the cost to repair or replace the property. Dkt. 237-3 at 3 (2013 policy); Dkt. 237-5 at 5 (2014 policy); Dkt. 237-6 at 7 (2015 policy). Crestline is thus entitled to recover the "amount which it would cost to repair or replace the property." *See Am. Ins. Co. v. Bateman*, 125 Ga. App. 189, 192-93 (1971).

In *Bateman*, it was irrelevant that the insured had not paid for the work on the building and might never be liable for that work. Because Bateman had an insurable interest in the property, he was entitled to recover under the terms of the policy. *Id.* The policy controls the amount of recovery, not the insured's ownership interest. *See also*

*Franks*, 320 Ga. App. at 134-39 (rejecting the insurer's contention "that the measure of his ownership interest, being less than sole and undivided, limits his recovery to a fraction of the policy limits").

Crestline had an insurable interest in the property and is therefore entitled to recover for the costs to repair the property under the policy. And, as a factual matter, Crestline did not admit that it had no damages; it indicated merely that, as the property manager, it either did not know the exact amounts incurred to fix the property and it had not paid out of pocket for remediation of the Hotel. *See* Dkt. 238-21 at 25 (RFA 72-74); Dkt. 238-19 at 161:18-165:13. That doesn't mean that Crestline did not suffer a covered "loss" under the meaning of the Policy or that it lacks an insurable interest in the hotel.

## CONCLUSION

Plaintiffs are entitled to coverage under the plain language of the policy and Georgia law. The district court erred by holding otherwise. The Court should reverse the district court's grant of summary judgment in favor of AFM and remand for further proceedings.

Respectfully submitted, this 27th day of June, 2022.

| | |
|---|---|
| Michael L. Childress | */s/ Frank M. Lowrey IV* |
| (admitted *pro hac vice*) | Michael B. Terry |
| *mchildress@childresslawyers.com* | Georgia Bar No. 702582 |
| Thomas J. Loucks | *terry@bmelaw.com* |
| (admitted *pro hac vice*) | Frank M. Lowrey IV |
| *tloucks@childresslawyers.com* | Georgia Bar No. 410310 |
| CHILDRESS LOUCKS | *lowrey@bmelaw.com* |
| & PLUNKETT, LTD. | Megan E. Cambre |
| 11 W. Illinois | Georgia Bar No. 167133 |
| 4th Floor | *cambre@bmelaw.com* |
| Chicago, Illinois 60654 | BONDURANT MIXSON |
| Telephone: 312-494-0200 |   & ELMORE, LLP |
| | 1201 W. Peachtree St. NW |
| Michael A. Dailey | Ste 3900 |
| Georgia Bar No. 203250 | Atlanta, Georgia 30309 |
| *mdailey@andersondailey.com* | Tel:  404.881.4100 |
| ANDERSON DAILEY LLP | |
| 2002 Summit Blvd. | Christopher B. Noyes |
| Suite 1250 | (admitted *pro hac vice*) |
| Atlanta, Georgia 30319 | *cn@kbklawyers.com* |
| Telephone: 404-442-1800 | Katherine A. Bruce |
| | (admitted *pro hac vice*) |
| | *kb@kbklawyers.com* |
| | Brian S. Kabateck |
| | (admitted *pro hac vice*) |
| | *bsk@kbklawyers.com* |
| | KABATECK LLP |
| | 633 W. Fifth Street, Ste 3200 |
| | Los Angeles, California 90071 |
| ***Attorneys for Appellants*** | Telephone: 213-217-5000 |

#3393586v1

57

## LOCAL RULE 7.1D CERTIFICATION OF COMPLIANCE

I hereby certify that this brief, filed on June 27, 2022, complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,975 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Century Schoolbook size 14-point font.

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV
Georgia Bar No. 410310
*lowrey@bmelaw.com*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on the date this certificate was signed, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

Dated:  June 27, 2022

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV
Georgia Bar No. 410310
*lowrey@bmelaw.com*
